Neal *et al. vs.* Patten *et al.*

---

JOHN NEAL *et al.*, plaintiffs in error, *vs.* GEORGE PATTEN *et al.*, defendants in error.

1. An executor cannot, by a power of attorney not authorized by the will, transfer the entire management of the estate which he represents to another, so as to bind creditors. Nor will such a power authorize the agent to sell any portion of the property, which, in his discretion, he may deem to be for the interest of the estate, and thus divest the claims of creditors upon the property sold.

2. A sale of property, by an agent appointed by such a power, is illegal as against creditors, and no subsequent ratification, either in express words, or by long acquiesence, on the part of the executor, can make it valid, so as to defeat their rights.

3. A solicitor of an executor cannot be compelled to produce the sworn answer of such executor, (who has died since the answer was made,) to a bill in chancery, which answer has never been filed, and which was left with such solicitor to file or not, as he thought best, when the administrator *de bonis non cum testamento annexo* objects. It comes within the rule applicable to confidential communications. Nor can he be compelled to testify to the contents of such answer, if it be lost or destroyed.

4. Whether an executor, without authority to that effect in the will, can sell annual crops of the estate by carrying only the samples of such crops to market, we leave undecided. So as to whether crops, made by the testator, come within the meaning of the term "annual crops," as used in the Code.

5. A purchaser who has bought and paid for property of an estate, from one not authorized to sell it, is not entitled, on a bill to marshal assets, which seeks to subject the property, so illegally sold, to the claims of the creditors of the estate, to share in the proceeds of the property, (which has been impounded and sold by order of the Court,) upon proof that his money was used in the payment of debts of the estate, not showing the character of the debts, nor their amounts, nor the persons to whom paid.

6. The report of the Auditor, in this case, was properly admitted to show the validity of the claims which had been passed upon by him, and which the complainants relied on as showing their interest in the subject matter in controversy.

7. On the trial of an issue, formed to ascertain the validity of a sale of the property of an estate, and which does not contemplate an order distributing the proceeds of the property (which has been sold, and the proceeds impounded by order of the Court) it is not necessary for creditors, whose debts are founded on contracts made before June, 1865, and who are contesting the validity of the sale, to file affidavits of the payment of taxes under the Relief Act of 1870.

8. The sayings of a person in possession of property, levied on against his title made at the time of the levy, are parts of the *res gestæ*, and should be admitted in evidence for what they are worth.

9. A charge not warranted by the evidence should not be given.

Power of attorney by executor. Sale under power by executor. Ratification. Attorney and client. Confidential communications. Annual crops. Sale by sample. Bill to marshal assets. Report of auditor. Tax affidavit. *Res gestæ.*

Charge of Court.   Before RICHARD SIMS, Esq., Judge *pro hac vice.*   Mitchell Superior Court.   May Term, 1872.

For the facts of this case, see the opinion.

LYON, DEGRAFFENREID & IRVIN; A. D. HAMMOND; VASON & DAVIS; JOHN RUTHERFORD, for plaintiffs in error. R. F. Lyon, Esq., submitted the following brief: 1st. The evidence of Smith was a confidential communication, and should have been excluded. 2d. The evidence was merely heresay. 3d. The sale of the cotton was illegal, because: First, the sale was by an agent of an executor, with no authority under the law to make such a sale: 22 Ga., 600. Second, it was not a public sale: Code, section 2514; 40 Ga. R., 363. 4th. Annual crops include only those of the current year. 5th. Appropriation of the proceeds of an illegal sale by an executor or his agent, cannot legalize the sale so as to defeat the rights of third persons.

H. MORGAN; JAMES L. SEWARD; WILLIS A. HAWKINS, for defendants in error.

MONTGOMERY, Judge.

Allen Cochran died November 30th, 1863, leaving a considerable estate, consisting of land and negroes, which he bequeathed to his two daughters, after payment of his debts. He owed a large amount to various creditors, some of whose claims were in judgment at the time ·of his death. He left his brother, Jubal Cochran, his sole executor and trustee for his daughters, one of whom was then married. The will conveyed no unusual power to the executor, as to the disposition of the property or management of the estate. The executor proved the will December 7th, 1863, and immediately executed a power of attorney to one Polhill, the testator's son-in-law, so broad in its terms as to amount, in effect, to a transfer of the entire administration into the hands of the agent thus appointed. Polhill took possession of the plantation,

negroes and other property in Mitchell county. The year the testator died about forty-five bags of cotton were made on the place, and the next year about as many more. In November, 1864, Polhill took samples of the cotton to Albany, and after offering it for sale to various persons, finally sold the crops of the two years to his factor; H. J. Cook, for George Patten, the defendant, who had deposited Confederate money with Cook to be invested in cotton. The cotton was left on the plantation, by agreement, during the war, subject to Patten's disposal.

From the emancipation of the negroes, and other causes, Allen Cochran's estate became insolvent. In 1865, Patten removed thirty-seven bales of the cotton, and sold them for over $5,000, when the judgment creditors levied on the remaining bales on the plantation. Patten filed his bill against the levying creditors, Jubal Cochran and Polhill, to enjoin the sale, and that the property might be decreed to be his. Jubal Cochran answered the bill, and placed his answer in the hands of his solicitor, W. G. Smith, to file, or not, as he deemed best. Before Smith could file it Cochran died. In this answer Cochran admitted executing the power of attorney to Polhill, and expressly ratified the sale of the cotton to Patten. The answer also stated, as information derived from Pothill, that about $20,000 of the money received from Patten had been applied to the payment of debts due by the estate of Allen Cochran, and a list of said debts was appended to said answer.

Pending this bill the creditors filed a bill to marshal the assets of Allen Cochran's estate, to which M. D. Potts, the administrator *de bonis non cum testamento annexo* of Allen Cochran, was made a party on the death of Crutchfield, the first administrator *de bonis non.*

The administrator appears on the record as defendant, but by cross-bill is really one of the complainants, being represented by the same counsel with some of the creditors, and joining in their prayer, so far as the issues now before the Court are concerned. This bill involves many issues between

Neal *et al. vs.* Patten *et al.*

conflicting claimants, but by agreement of parties the only ones presented to the Court below for trial, and now brought here for review, are those growing out of the purchase by Patten of the cotton of the estate of Allen Cochran, consisting of about ninety bales, from Polhill.

The creditors and administrators insist that the power of attorney from Jubal Cochran, as executor of Allen Cochran, to Polhill, was void as against them, and the sale of the cotton illegal. Patten, of course, insists the sale is regular. Patten and Polhill are both parties defendant to the creditor's bill. Polhill, in his answer, says he used about $30,000 of the money received from Patten for the cotton in paying the debts of the estate of Allen Cochran, not specifying the character of the debts, their several amounts, to whom paid, nor when.

On the trial, Patten offered W. E. Smith to prove the contents of the answer of Jubal Cochran (which had been lost by him,) to Patten's bill. Counsel for the administrator and creditors objected, but the Court admitted the testimony. Smith was unable to recollect anything more definite as to the debts paid by Polhill than the latter states in his answer to the creditor's bill. The complainants also insisted that the sale of the cotton to Patten was invalid, because it was not brought to market and sold, and that the sale of the crop made by the executor was invalid, because not sold at public sale, the law authorizing an administrator to sell annual crops in market at private sale, only applied to such crops as were made by the administrator himself. Patten insisted that if the sale was invalid, then he was entitled to have his money refunded, as it was proved to have gone in payment of the debts of the estate to the extent of $30,000 00, and that, although he had paid Confederate money, yet the money had paid gold debts of the estate to that amount, and he was, therefore, entitled to have that amount refunded. During the progress of the trial, the complainants offered in evidence the report of an auditor, by whom their claims had been audited under direction of the Court. Patten objected to the evidence and the Court overruled the objection. Patten also moved to exclude

from the jury the *fi. fas.* of the creditors, because it did not appear by any evidence that the taxes on said *fi. fas.* had been paid. The Court overruled the motion. Patten's counsel also proposed, on cross-examination of the sheriff, who made the levy, to ask him what Polhill said in reference to the cotton levied on at the time of the levy, the sheriff having found the cotton at that time in Polhill's possession. The Court refused to permit the question to be asked. The Court, among other things, charged the jury, " if Cook, the warehouseman and factor, took commissions from Polhill for selling the cotton for him, and from Patten for buying, unless both parties knew it at the time, and consented to it, it was a fraud, and the sale was void," which charge Patten alleges was unauthorized, because there were no facts to sustain it. The jury found the sale to Patten valid. On the foregoing facts the case comes before the Supreme Court, by double bill of exceptions, each party excepting to the rulings and charges against him.

1. The first question presented for our consideration is, had the executor power to give a power of attorney so broad in its terms as to amount, in effect, to a resignation of his trust? Counsel for Patten relies, with much confidence, on the case of Howard *vs.* Baillie, 2 Henry Black., 623, to establish the right of the executor to make such a power. Certainly the power set out in the case relied on is broader even than the one now under consideration, if that is possible. That, however, was a suit against an executrix, who had executed such a power to her agent, to hold her *personally* liable, on the acceptance of a bill of exchange, drawn on her as executrix, which acceptance had been written by the agent, who had signed her name as executrix. The Court held that she was personally liable. No question was made as to whether a power so broad in its terms would be good as against the interests of third parties.

This decision was made by the Court of Common Pleas, in 1796, and it is worthy of remark that the same power of attorney, in the same year, came before the Court of King's

Neal *et al. vs.* Patten *et al.*

Bench, on precisely the same state of facts, and that Court held. that she was not personally liable on the acceptance: Gardner *vs.* Baillie, 6 T. R., 591. In neither case, however, was the power of an executor to execute such a letter of attorney raised. It may have been that the will authorized it; at all events those cases can hardly be considered as overturning the well settled principle, *delegatus non protest delegare.* When a power of sale is given to trustees or executors, they cannot sell by attorney: 1 Sugden on Powers, 214, (3d American edition;) 2 Williams on Executors, 807, (3d American edition.) We are satisfied, therefore, that the power of attorney given in the present case, by Jubal Cochran to Polhill, was invalid as against creditors, and that no sale by Polhill under it could divest them of their rights.

2. Such a sale, being illegal in its inception as against the right of creditors, we think no subsequent ratification by the executor, whether by long acquiescence or by express words, could affect their rights. It will be recollected this sale occurred prior to the passage of the 2154th section of the Code.

3. The next question which arises in the case is whether the testimony of W. E. Smith was properly admitted by the Court. It will be borne in mind that Jubal Cochran answered *as executor*, and that the administrator *de bonis non cum testamento ·annèxo*, representing the identical interests which Jubal Cochran had represented in his lifetime, was the objecting party. What difference, in principle, is there between this case and one where the adverse party puts the counsel of his opponent upon the stand, and seeks to make him disclose the communications of his client? We see none: Code, 3744, 3745. We, therefore, think the Court erred in admitting this testimony over the objection of the administrator.

4. We do not find it necessary to decide whether an executor may sell annual crops under the 2514th section of the Code, by carrying the samples of such crops only to market, nor whether the term " annual crops," as used in that section, means only such crops as the executor may make in the course

Neal *et al. vs.* Patten *et al.*

of his administration, or whether it includes any crops which his testator may have made in his lifetime.

5. We will not now undertake to say what equity Patten might have claimed, had he shown that his money went into the hands of the executor, and had been used by him in paying certain specific debts, whose respective amounts and character were clearly shown. But the mere loose statement by Polhill, in his answer, that he had used about $30,000 00 of this money to pay debts of the estate, without more, is clearly insufficient. If the money was really so used, the executor's returns should show it, or some other evidence equally satisfactory in its nature. This being clearly shown, we will not say that he might not have been entitled to have the money refunded to him out of the proceeds of the cotton which had been levied on, and which was sold by order of Court.

6. We think the auditor's report was properly admitted in evidence to show that the contesting creditors' claims had been passed upon by him, and that he considered them valid; and that, therefore, they had a substantial interest in contesting the validity of the sale of the cotton.

7. Nor do we think on the trial of this issue there was any necessity for the creditors to attach affidavits of the payment of taxes to their *fi. fas.,* even though their claims existed before June, 1865. They were not asking a distribution of the money, but simply trying an issue, the object of which was to ascertain if there was any money to distribute.

8. We think the Court should have permitted the defendant to prove, by the sheriff, what Polhill said at the time of the levy, going to show that he did not own the cotton levied on. It was part of the *res gestœ.* What it was worth, in view of the fact that Polhill's answer was in Court, may be questionable; still, it should have been admitted on the principle above stated.

9. In conclusion, we think the exception taken by defendants' counsel, to the charge of the Court upon the subject of fraud, well taken. The evidence showed that all parties were

fully cognizant of Cook's relations to the whole transaction, and there was no evidence to warrant this charge of the Court.

Let the judgment of the Court below be reversed.